UNITED STATES of America, Plaintiff,

v.

Martin J. DEMPSEY, et al., Defendants.

No. 89 CR 666.

United States District Court,
N.D. Illinois, E.D.

May 31, 1991.
Nunc Pro Tunc May 24, 1991.

See also 768 F.Supp. 1256.

**1280**

Ira H. Raphaelson, Thomas M. Durkin, Mark L. Rotert, Asst. U.S. Attys., Chicago, Ill., for plaintiff.

James R. Epstein, Epstein Zaideman & Esrig, P.C., Chicago, Ill., for Martin J. Dempsey.

Donald C. Shine, Nissen & Elliot, Chicago, Ill., for Charles W. Bergstrom.

George B. Collins, Collins & Bargione, Chicago, Ill., for Bradley Ashman.

Nicholas F. Maniscalco, Chicago, Ill., for William A. Barcal, III.

Matthias A. Lydon, Jayne Carr Thompson, Lydon & Griffin, Chicago, Ill., for Edward A. Cox, III.

Thomas M. Breen, Martin & Breen, Oak Park, Ill., Nan R. Nolan, Chicago, Ill., for Thomas P. Kenney.

Gordon B. Nash, Jr., Gardner Carton & Douglas, Chicago, Ill., for John Ryan.

Thomas K. McQueen, Jenner & Block, Chicago, Ill., for Joel J. Fetchenhier.

Royal B. Martin, Leigh D. Roadman, Silets and Martin, Ltd., Chicago, Ill., for Sheldon Schneider.

Michael D. Monico, Monico Pavich & Spevack, Chicago, Ill., for John A. Vercillo.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

By agreement of the parties, the nine defendants who will be sentenced today have filed various written motions and objections to their presentence reports in anticipation of the sentencing proceedings in this case and the government has responded to these motions and objections. Both sides have filed memoranda in support of their positions. Also by agreement of the parties, no evidentiary hearings are required because there are no factual disputes. The court will now address the issues presented by the parties' written submissions.

*Joint Motion to Disregard Guideline § 2E1.1(a)(1) and/or For Downward Departure Under 18 U.S.C. § 3553(b) and Guideline § 5K2.0*

All eight of the defendants convicted of substantive RICO or RICO conspiracy have joined in a motion which requests that this court refuse to apply Guideline § 2E1.1(a)(1), the appropriate sentencing guideline which the United States Sentencing Commission ("Sentencing Commission") has assigned to a conviction for racketeering. They argue that in setting the offense level for RICO at 19, the Sentencing Commission failed to follow Congress' statutory directive to "establish sentencing policies ... [which] ... assure the meeting of the purposes of sentencing as set forth in [18 U.S.C.] § 3553(a)(2)." 28 U.S.C. § 991(b)(1)(A). Such sentencing purposes include, for example, punishment and deterrence. 18 U.S.C. § 3553(a)(2)(A), (B). Alternatively, all ten defendants ask that, even if the court upholds the legality of Guideline § 2E1.1, they be granted a downward departure under the "unique circumstances" presented in this case pursuant to 18 U.S.C. § 3553(b) and Guideline § 5K2.0. As best as the court can determine, the basis for both of these arguments is that the Guidelines are too harsh when applied to the "unique circumstances" present in this case.

█ As to their first argument, defendants assert that the Commission's approach to Guideline § 2E1.1 is simply that "a racketeer is a racketeer is a racketeer" and that all racketeers should be sentenced harshly regardless of what, if any, mitigating circumstances exist concerning "how the RICO statute was violated." Such an

approach, the defendants claim, does not comply with Congress' directives to the Commission in that it "fails to make relevant distinctions about specific offense characteristics that may and can differ when violations of RICO occur." Defendants ask the court to hold that Guideline § 2E1.1 is invalid insofar as it applies to the "unique circumstances" of their case.

Defendants' argument has several fatal flaws. First, Congress has decided that RICO is a specific, identifiable crime apart from any underlying predicates. Thus, it is entirely proper for the Sentencing Commission to assign a specific offense level to that crime just as it has done with every other specific crime. What that specific offense level should be is a judgment call which Congress *asked* the Sentencing Commission to make. RICO is a statute directed at repetitive criminal conduct, i.e., a *"pattern"* of racketeering activity. Thus, far from acting contrary to its statutory directive, it is both logical and correct that the Sentencing Commission chose a specific offense level for RICO which punishes such activity more harshly than other specific offense levels punish nonrepetitive criminal conduct.

Second, the court fails to see what mitigating circumstances could possibly exist concerning *how* the RICO statute is violated. The way these defendants violated the RICO statute is not a mitigating factor. Finally, as discussed *infra,* defendants' contention that there are "unique circumstances" present in this case is simply not true.

For these reasons, the court rejects defendants' contention that the Sentencing Commission failed to follow Congress' directives in setting a specific offense level for RICO violations because the result in their case is that they are being punished too harshly.

■ All ten defendants alternatively move for a downward departure from their respective guideline-mandated base offense levels. The statutory authority to grant the downward departure which defendants seek is found at 18 U.S.C. § 3553(b). That section authorizes a court to depart from the otherwise applicable guideline range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately considered by the Sentencing Commission in formulating the guidelines." Section 3553(b) further provides that "in determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." *Id.*

In Guideline § 5K2.0, the Sentencing Commission sets forth its Policy Statement regarding departures pursuant to 18 U.S.C. § 3553(b). Guideline 5K2.0 states that the purpose of the subsequent 5K2 guidelines is to specifically identify *"some* of the factors that the [Sentencing] Commission has not been able to take into account fully in formulating the guidelines." (Emphasis added). None of the specific 5K2 guidelines apply in this case. Guideline 5K2.0 provides, however, that the specified 5K2 guidelines are not an exclusive list of circumstances warranting departure pursuant to 18 U.S.C. § 3553(b). Specifically, guideline 5K2.0 provides as follows:

[a]ny case may involve factors in addition to those identified [in the 5K2 guidelines] that have not been given adequate consideration by the [Sentencing] Commission. Presence of any such factor may warrant departure from the guidelines, under some circumstances, in the discretion of the sentencing court.

Defendants' § 5K2.0 argument is that the Sentencing Commission failed to "adequately consider" the "unique circumstances" of their case. The premise of this argument is defendants' contention that "despite the indictments in the instant matter, the underlying conduct in this case involved nothing more than plain and simple garden variety violations of the Commodity Exchange Act, which the government dressed up, reconfigured as mail and wire fraud, multiplied 700 fold and labelled as RICO." That is an argument which defendants asserted pretrial, during trial, and which they still continue to assert, perhaps as much to convince themselves as

to convince the court. The jury decided that there was more to defendants' conduct than "garden variety violations of the Commodity Exchange Act." Defendants are not being sentenced on the basis of the government's charges. They are being sentenced on the basis of the jury's verdict. Defendants put the government to the test and the government won. A jury of their peers have unanimously found that the government proved beyond a reasonable doubt that which it charged.

There is nothing unique about this case. The key issue in this case, as in many RICO cases where the underlying predicates are mail fraud or wire fraud, was whether or not the defendants' "garden variety" Commodity Exchange Act violations were committed with an intent to defraud Chicago Board of Trade customers. If the government proved an intent to defraud, they could prove mail fraud or wire fraud. If they proved a "pattern" of mail fraud or wire fraud, they proved RICO. The jury concluded that the government proved these things and therefore that defendants violated RICO. The jury concluded that the defendants did so by lying, cheating, taking advantage of their customers, and self-dealing amongst themselves. Defendants' dressed-up-garden-variety-Commodity-Exchange-Act-violations argument has been swallowed up by the jury's verdict. There are no "unique circumstances" in this case that would move the court to depart from the guidelines.

■ The court also rejects defendants' argument that the court should depart downward on "unique circumstances" grounds so that defendants can be "proportionally sentenced" as compared to sentences received by other traders in other pits who pleaded guilty to charges in other indictments. Those other cases simply must stand on their own. This court does not know if the conduct of the defendants in those cases was the same as or different than the conduct of the defendants in this case, whether the proof in those cases was different than the proof in this case, or whether those other defendants merely dodged a bullet. Defendants in this case have no right to have their sentences adjusted on such a comparative basis. This circumstance is not grounds for departing downward pursuant to 18 U.S.C. § 3553(b) and Guideline § 5K2.0.

*Ryan's Downward Departure Motion*

■ Defendant Ryan "acknowledges that the primary sentencing goals to be achieved in this case are punishment and the general deterrence of commodities trading law violations ..." Ryan argues that "those goals have already been achieved in [his] case." Thus, Ryan moves for a downward departure, also pursuant to 18 U.S.C. § 3553(b) and Guideline § 5K2.0 because the guidelines do not adequately consider the "circumstances and characteristics" of his case.

Ryan's argument is that the circumstance in his case which was not adequately considered by the sentencing commission is his family and community ties. In this regard, however, Congress expressly directed the Sentencing Commission to "assure that the guidelines and policy statements, in recommending a term of imprisonment, reflect the general *inappropriateness* of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant." 28 U.S.C. § 994(e) (emphasis added). In keeping with this statutory directive, the Sentencing Commission has promulgated Guideline § 5H1.6 which provides in relevant part that "[f]amily ties and responsibilities and community ties are not *ordinarily* relevant in determining whether a sentence should be outside the guidelines." (emphasis added). Ryan's contention is that his case "is not the ordinary case." Ryan's argument is, essentially, that he has been punished enough already and therefore should not be sentenced to a period of incarceration. In *United States v. Carey*, 895 F.2d 318, 326 (7th Cir.1990), the Seventh Circuit expressly rejected Ryan's proposed "I-have-suffered-enough" basis for a downward departure on the grounds of inadequate consideration by the Sentencing Commission unless the "suffering" is "exceptional." *Id.* This court be-

lieves that the strain which a prison sentence would impose on Ryan's family and community ties is "ordinary", *not* "exceptional." It is not "exceptional" that a defendant who must serve a sentence of incarceration must be separated from his family, his friends, his community, and his means of earning a livelihood.

*Abuse of Position of Trust or Use of Special Skill*

■ Guideline § 3B1.3 provides for a two-level increase in the base offense level "[i]f the defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or concealment of the offense ..." That guideline also provides, however, that this adjustment "may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."

The government argues, and the probation office recommends, that all ten defendants be given this upward adjustment. Defendants argue to the contrary for various reasons. Those defendants who acted only as local traders argue that they, unlike their broker codefendants did not hold, and therefore could not have abused, a position of public or private trust because they had no customers who placed their trust in these defendants.

The court need not address the abuse of trust issue, because Guideline § 3B1.3 mandates the two-level increase for abusing a position of trust *or* for using a special skill "in a manner which significantly facilitated the commission or concealment of the offense." (Emphasis added). Various defendants argue for various reasons either that they possessed no "special skill" or that even if they did, such skill did not "significantly facilitate the commission or concealment of the offense." All of these arguments are without merit, especially in light of the arguments at trial by various defense counsel that the defendants did what they did not in an effort to defraud customers, but because their jobs were so difficult and complicated that errors and outtrades were common occurrences. None of these defendants traded in the soybean pit simply because they submitted a job application and were hired. They had to take extensive preparatory classes and pass various exams before they could even be considered for the privilege of trading in the pits, a privilege which the public investor does not have. This court has no doubt that all of these defendants possessed a "special skill", namely, trading commodities futures.

Thus, the court finds that all ten defendants possessed "special skills" which directly and *very* "significantly facilitated" both the commission and the concealment of their offenses.

Nevertheless, various defendants argue that the § 3B1.3 two-level upward adjustment should not apply to them because their special skills are "included in the base offense level or specific offense characteristics." This argument might have merit if the defendants' base offense level was that prescribed for violations of the Commodity Exchange Act. That is not the case, however. Eight defendants have base offense levels for RICO convictions. The other two defendants have base offense levels for mail fraud and wire fraud convictions. A special skill is not an element of any of these offenses. Both the RICO statute and the mail fraud and wire fraud statutes can be violated in numerous ways without utilizing a special skill. Thus, using a special skill is not "included" in the base offense levels for these crimes. Rather, the *manner* in which these defendants committed these crimes involved the use of special skills. That is precisely the situation in which Guideline § 3B1.3 requires the two-level upward adjustment to the base offense level.

Accordingly, the court finds that all ten defendants' base offense levels should be increased by two levels pursuant to Guideline § 3B1.3.

*Minor or Minimal Participant*

Defendants Ryan, Fetchenhier, Schneider, Kenney, Ashman, and Cox ask that they be granted a reduction in their base offense levels pursuant to Guideline § 3B1.2. This guideline permits two-to-four point reductions in the base offense level if the

defendant is either a "minor" or "minimal" participant in the offense. If a defendant was a "minimal" participant in the criminal activity, his base offense level should be decreased by four levels. If a defendant was a "minor" participant in the criminal activity, his base offense level should be decreased by two levels. If a defendant falls somewhere in between "minor" and "minimal", his base offense level should be decreased by 3 levels.

■ A defendant who seeks a § 3B1.2 reduction bears the burden of persuasion by a preponderance standard. *United States v. Kingston*, 922 F.2d 1234, 1240 (6th Cir.1990). That burden cannot be satisfied simply by making conclusory statements that the defendant is less culpable than his cohorts. *United States v. Gordon*, 895 F.2d 932, 935–36 (4th Cir.1990). The defendant must show not simply that he is less culpable than his codefendants, but that his culpability was lower to such a substantial degree that the reduction is warranted. *Id.*

Application note 2 to Guideline § 3B1.2 states that it is intended that the downward adjustment for a "minimal" participant will be used infrequently. It would be appropriately applied, for example, in the case of an individual who played no other role in a very large drug smuggling operation than to offload part of a single marijuana shipment or an individual who was a mule in a single smuggling transaction involving a small amount of drugs.

■ The court rejects the government's argument that the relevant inquiry in determining the propriety of granting the § 3B1.2 reduction is whether a particular defendant knew less than did his codefendants about the nature and workings of the conspiracy. In this court's opinion, a defendant's lack of knowledge or understanding of the scope and structure of the conspiracy and of the activities of his codefendants is *a factor*, but not the *only* factor, which the court should consider. The relevant inquiry is whether a particular defendant is less culpable than the average participant in the criminal activity. Guideline § 3B1.2 was clearly intended to

apply to defendants who were plainly among the least culpable of those involved in the conduct of the group.

The Ninth Circuit Court of Appeals has recently held that a court should consider not only the relevant conduct of the other participants in the offense prosecuted, but also measure the defendant's individual conduct and relative culpability against the offense elements. *United States v. Andrus*, 925 F.2d 335, 338 (9th Cir.1991) (*citing United States v. Daughtrey*, 874 F.2d 213 (4th Cir.1989)).

■ While the court does not believe that defendant Fetchenhier's conduct was "minimal", the court does believe that, in comparison to the conduct of his codefendants and measured against the elements of RICO conspiracy, he was a "minor" participant in the RICO conspiracy. Fetchenhier stands convicted of four felonies, including two predicate acts of wire fraud. Four of his codefendants were convicted of between 36 and 61 offenses and four other codefendants were convicted of between 11 and 24 offenses. Even his codefendant who was acquitted of RICO conspiracy was still convicted of 23 felonies. Given the limited number of transactions in which Mr. Fetchenhier participated, the limited number of defendants with whom he engaged in transactions—specifically, two—and the comparatively small amount of money which the government claims he gained through his illegal trades—approximately $1800—the court feels that he is entitled to a two-level reduction as a "minor" participant.

■ Defendant Ryan's counsel informs the court that the probation officer informed him that Ryan was not given a § 3B1.2 reduction because his knowledge of illegal trading and culpability was viewed as being identical to that of the other defendants who were convicted at trial. As previously indicated, it is relative culpability as compared with a particular defendant's codefendants, and not merely the defendant's knowledge which is the relevant inquiry. The court believes that Ryan was not a "minimal" participant in

the charged mail and wire fraud scheme and Ryan does not even argue that he should be so categorized. As compared to his wire fraud co-schemers, however, Ryan's misconduct, even as viewed by the government, was moderate. Ryan was convicted of only one count of wire fraud. He gained a relatively small dollar amount—$325—from his illegal trading activity.

The difference in degree between Ryan's conduct and that of his co-schemers, involving significantly fewer illegal trades and significantly less personal gain, reflects his position as a "minor" participant in the charged wire fraud scheme. He is therefore entitled to the two-level reduction under § 3B1.2.

As to all the other defendants who seek a § 3B1.2 reduction for their role in the offense, they quite simply have been substantively convicted of too many predicate acts to be considered either a "minimal" or a "minor" participant. The best that could be said for them is that they willingly accepted profits from the conspiracy or scheme alleged and shared information with their cohorts. They simply did not avail themselves of the opportunity as often as did certain other codefendants. Accordingly, their requests for reductions pursuant to guideline § 3B1.2 are denied.

*Kenney's Motion For Reduction of Base Level Offense Pursuant to Guideline § 2X1.1(b)(2)*

■■■■ Defendant Kenney argues (and several of his codefendants adopt this argument), that he is entitled to a three-level reduction in his base offense level pursuant to Guideline § 2X1.1(b)(2). That Guideline provides as follows:

> If a conspiracy, decrease by 3 levels, unless the defendant or a co-conspirator completed all the acts the conspirators believe necessary on their part for the successful completion of the offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control.

The court simply directs defendants' attention to subsection (c) of that same guideline which provides in relevant part as follows: "When a[ ] ... conspiracy is expressly covered by another offense guideline, apply that guideline section." In this case, the conspiracy is a RICO conspiracy which is "expressly covered by another offense guideline section", namely, Guideline § 2E1.1. Thus, Guideline § 2X1.1 does not apply to this case. Even if it did apply, however, neither Kenney nor any of his RICO coconspirators would be entitled to this adjustment because all of them were substantively convicted of at least two of the charged predicate acts in furtherance of the RICO conspiracy. Thus, none of these defendants can be heard to argue that they did not "complete all the acts [which they] believed necessary on their part for the successful completion of the offense." The court need not otherwise address the merits of Kenney's argument under Guideline § 2X1.1.

*Barcal's "Loss" Increase*

■■■ Guideline § 2F1.1(a) provides for a base offense level of six for a mail fraud conviction. Guideline § 2F1.1(b)(1)(B) provides for a one-level increase if the "loss" exceeded $2,000 but was less than $5,000. Application note 7 to this guideline refers the court to the commentary to Guideline § 2B1.1 (regarding larceny, embezzlement, and other thefts). Application note 2 to Guideline § 2B1.1 defines "loss" as "the value of property taken." In its presentence submissions to the probation office, the government submitted two calculations with respect to the amount of gain to Barcal and his codefendants resulting from the illegal trades in which the jury found that Barcal participated. Both of these calculations were computed by analysts at the Commodities Trading Futures Commission. One calculation was $4,575. This figure represents the *total* amount of illegal gain to Barcal *and* his codefendants with whom he executed his illegal trades. The second calculation is $1,662.51. This figure represents that portion of the $4,575 which went into *Barcal's* personal pocket after he and his codefendants divvied up the $4,575

**1286**

amongst themselves. Barcal argues that, for purposes of Guideline § 2F1.1(b)(1), he should only be deemed to have illegally caused a "loss" of $1,662.51. While the court believes that this amount is the appropriate figure for the restitution portion of Barcal's sentence, the court agrees with the government that Barcal should be charged with the entire amount of $4,575 for purposes of Guideline § 2F1.1(b)(1). The court deems it disingenuous at best to reward a defendant under the guidelines simply because he was generous enough to share his ill-gotten gains with his co-schemers. All $4,575 of the illegal gain flowed directly from Barcal's illegal trading activity. Accordingly, the court will increase Barcal's base offense level by one level pursuant to Guideline § 2F1.1(b)(1)(B).

### Obstruction of Justice

■ Guideline § 3C1.1 instructs the court to increase the offense level by two levels if the defendant "willfully impeded or obstructed, or attempted to impede or obstruct, the administration of justice during the investigation or prosecution of the instant offense."

The Seventh Circuit's recent opinion in *United States v. Lozoya–Morales*, 931 F.2d 1216 (7th Cir.1991), clearly establishes that granting a § 3C1.1 increase based *solely* upon a jury's verdict is improper. The Seventh Circuit based its conclusion on *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), from which Guideline § 3C1.1 was born. While recognizing that the criminally accused do possess the right to testify, the Court in *Grayson* held that this right is not impermissibly chilled when the sentencing judge imposes a stiffer sentence based upon the judge's determination that the defendant committed perjury. But *Grayson* does not give a wholesale right to adjust every time a jury returns a guilty verdict after a defendant has testified and the Seventh Circuit so construed Guideline § 3C1.1 in *Lozoya–Morales*. The Seventh Circuit explained as follows:

To enhance the sentence simply because the defendant testified—without a finding by the judge that he lied about a material subject, or the clear implication of the jury's verdict that he must have done so—is to punish the testimony simpliciter which raises grave constitutional questions.

*Lozoya–Morales*, at 1219.

Thus, while the sentencing court *may* independently find that a defendant who testified in his defense committed perjury and thus increase his base offense level under § 3C1.1, the § 3C1.1 obstruction of justice increase may not rest upon the jury verdict alone.

Application note 1 to § 3C1.1 instructs that testifying untruthfully or suborning untruthful testimony concerning a material fact would provide a basis for enhancement. Application note 2 instructs the court to evaluate suspect testimony in a light most favorable to the defendant. Application note 3 states that "[t]his provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt is not a basis for application of this provision."

In this court's opinion, defendants Cox and Ashman took the stand, essentially, not to deny their actions, but to deny that they acted with the requisite criminal intent. The jury did not believe them, but that alone is not enough to impose the § 3C1.1 base offense level increase. Their testimony is not the type of "willful" obstruction contemplated by Guideline § 3C1.1 and its application notes. The court therefore will not impose the two-level increase.

### Acceptance of Responsibility

■ The applicability of Guideline § 3E1.1, which permits a two-level decrease to the base offense level for acceptance of responsibility requires a much different analysis than that required by the obstruction of justice guideline. While a defendant's denial of guilt is not a basis for application of the obstruction of justice guideline, a defendant must affirmatively accept personal responsibility for his criminal conduct in order to be deemed to have accepted responsibility under § 3E1.1.

Guideline § 3E1.1 instructs that if the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, his offense level should be reduced by two levels. District courts have broad discretion to grant or deny the reduction for acceptance of responsibility. It is most frequently denied, even to those who plead guilty, simply because, in the sentencing court's view, the defendant has failed to accept responsibility for the criminal conduct.

The court quotes application note 2 to Guideline § 3E1.1, which seems to focus on what is really the case here:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential *factual* elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In *rare* situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to *factual* guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

(Emphasis added). The issue then, is whether any of the defendants in this case presents such a "rare" situation.

A determination that a defendant has accepted responsibility results in a reduction from the base offense level otherwise applicable to his criminal conduct and is thus something which a defendant must earn. *United States v. Monsour*, 893 F.2d 126, 129 (6th Cir.1990). For this reason, the defendant bears the burden of proof on the issue of whether he should receive the acceptance of responsibility reduction.

*United States v. Camargo*, 908 F.2d 179, 185 (7th Cir.1990).

As the Seventh Circuit recently noted, it is appropriate, in determining whether a defendant has accepted responsibility, for the court to consider whether a defendant's expression of regret is tailored for purposes of a sentencing procedure or is instead an expression of culpability rendered in advance of that final hour. *United States v. Osborne*, 931 F.2d 1139, 1155 (7th Cir.1991). In *Osborne*, the Seventh Circuit affirmed the district court's conclusion that a defendant who had pled guilty had not sufficiently accepted responsibility. The Seventh Circuit explained as follows:

> [Defendant] expressed some remorse and greater truthfulness concerning his drug involvement at the final hour, the moment of sentencing, but his failure to demonstrate the same truthfulness and remorse prior to sentencing is certainly a factor upon which a judge might and could properly rely in determining that [he] failed to accept responsibility.

The timeliness of a defendant's conduct in manifesting acceptance of responsibility is a factor also duly noted in the application notes to § 3E1.1.

It has been this court's opinion throughout these proceedings that this case was not as much about what the defendants did as it was about the name which the jury would attach to that conduct. In testimony or in argument, most of the defendants essentially admitted that they did what the government said they did. The court does not recall that any of the defendants denied violating those Commodity Exchange Act charges for which fraudulent intent was not an element of the offense. However, defendants steadfastly maintained throughout the trial (and some of them still maintain) that that which they did should not be classified as substantive RICO, RICO conspiracy, mail fraud, or wire fraud.

In resolving the issue of acceptance of responsibility, the court must take into account the practical consequences of the government's charging decision. We have an adversary system, but the guidelines make the government the most powerful

player in the game. The government makes the charging decision, and all the other players have to respond within that framework. The government decides what it will allow a defendant to plead to. The government may be called upon to prove that which is charged (maybe not), and it is hoped that prosecutors understand that their primary and overriding goal is to do justice. Nevertheless, the government sets the stage. It is no more the court's place to criticize the government's charging decision than it is the court's place to criticize the defendants' response to that decision.

At the risk of oversimplification, it would seem that the question before the court then, is whether the defendants can accept responsibility for their conduct without accepting the government's charging decision. Should a defendant be denied the acceptance of responsibility reduction merely because he went to trial to contest the applicability of substantive RICO or RICO conspiracy to his conduct? The court thinks not. Application note 2 to Guideline § 3E1.1 precludes any other conclusion.

■ A defendant can maintain an entrapment defense and still receive the two-level reduction for acceptance of responsibility. *See e.g., United States v. Fleener*, 900 F.2d 914, 918 (6th Cir.1990). Clearly, a defendant can accept responsibility for his actions and still contest on appeal the constitutionality of the search and seizure that yielded the evidence which brought him to court. In the same vein, application note 2 would permit a defendant to receive the acceptance of responsibility reduction if he were to say something to the effect of "I did these acts. I violated the rules of the Chicago Board of Trade and certain provisions of the Commodity Exchange Act. I am sorry for my actions, but my actions do not constitute substantive RICO or RICO conspiracy."

The court has read the various defendants' versions of their offenses. The government agrees that defendant Vercillo (who is not being sentenced today) has adequately shown acceptance of responsibility. Vercillo has clearly demonstrated acceptance of responsibility to this court's satisfaction. The relevant portions of Vercillo's version of the offense are as follows:

> This is very hard for me to say: I know that my activity while trading at the Chicago Board of Trade violated the law and deprived customers of their fair share of the market. I am terribly sorry for what I have done.

Vercillo also discusses his joining the Chicago Board of Trade and his development as a trader. His version of the offense continues as follows:

> I ... did things not lawful. At some point I was introduced to a method of facilitating orders with a broker which would lead to a no loss situation for myself and a faster execution of the order for the broker. However, engaging in this process deprived the customer of their fair share of a market opportunity. It hurt the customer for it was not executed openly in the market and hence the customer could never realize the full potential of his profit or loss.
>
> Trading in the pit was like nothing I had experienced before. Winning became everything. When leaving the trading floor the only thing that mattered was whether or not I made money. I did not care what happened to others, or who I hurt, as long as I came out ahead. I have no sense of excuse or can I say that I did not intend to defraud. I knew my behavior was hurting people and customers alike. For in the game of trading, making money meant everything and *self* was always ahead of everything else.
>
> I admit my complicity in aiding and abetting the broker for I did not care if my actions or his hurt the customer. At first I was bitter for being singled out by the United States Government as a felon, but over time my attitude has changed and I now realize that these charges could not have happened without me having done something wrong. I accept responsibility for my actions and plead for any consideration the court can give me. I am truly remorseful and have learned a

lesson both in life and in view of what is right and wrong.

I don't say these things to justify what I did. I no longer can. I have not traded personally since subpoenas were issued several years ago.

I have always admitted my behavior was wrong and would have pled guilty but for the issue of RICO and its consequences. My only reason for going to trial was to object to being a racketeer, and to try and salvage some of my possessions which the Government said were forfeitable.

Vercillo concludes his version of the offense as follows:

I just want this matter behind me so I can go on with life having as free a [conscience] as possible under the circumstances. I am sorry for what I have done and I accept responsibility for my conduct.

That, the court finds, is a paradigmatic example of acceptance of responsibility.

 With respect to the nine other defendants, the court believes that there is a distinction to be drawn between those defendants who say, "I did wrong but it wasn't RICO or a conspiracy" and those who say "I didn't intend to defraud anybody." Those in the first category are contesting a legal conclusion and thus fall squarely within the "rare" circumstance contemplated by application note 2 to Guideline § 3E1.1 in which a defendant who goes to trial *may* nevertheless get the acceptance of responsibility reduction. Those in the second category refuse to acknowledge the jury's factual finding of criminal intent. While the court does not believe that Guideline § 3E1.1 requires an act of contrition of the magnitude of defendant Vercillo's, it certainly does require some acknowledgement of the criminality of one's conduct.

 In contrast to defendant Vercillo, what have the nine other defendants said? Defendant Kenney says "I am truly sorry for my actions ... I accept the decisions of the court and accept responsibility for my actions." The court agrees with the proba-

tion officer that Kenney is entitled to the acceptance of responsibility reduction.

 Defendant Ashman, when he talks about trading after the bell, "matching", and getting on the other side of an order says,

I did it ... it is against the rules and it is also a federal felony and I must accept that it was wrong to do that because it is against the law. It is no excuse that it was generally how business was done and that it happened every day ... Two brokers would each put trades to me directly and not by open outcry and some money would be made by me without risk ... It is hard for me to understand RICO and conspiracy. But I understand that I was convicted for what I did and that the jury believed that I was working with the other defendants to violate the mail fraud law at least twice and since I was convicted of two mail frauds, I must accept my responsibility for that too.

The court finds that Ashman is entitled to the two level reduction for acceptance of responsibility.

 Barcal has not asked for the acceptance of responsibility reduction nor does it appear to the court that he is entitled to it. He denies any wrongdoing even though the evidence showed he was a willing participant and that he engaged in illegal activity when it was to his advantage. That is not acceptance of responsibility.

As to the six remaining defendants, the court is not convinced so far that any of them have accepted responsibility for their criminal conduct, but will await the defendants' exercise of their right to allocution before making a final determination of this issue. In all candor, however, some of these defendants have a tougher row to hoe than others.

Defendant Dempsey says, "I broke the rules. I didn't intend to cheat anyone and don't feel that I did. I did what everyone else did." Defendant Bergstrom says, "I was engaging in a common business practice that did not result in customer loss. I never intended to defraud anyone." Defendant Fetchenhier also denies having acted with an intent to defraud customers and

also claims he was merely engaging in an accepted practice.

The court, as gently as possible, wishes to remind these defendants that the "everybody-else-does-it" defense is not a justification for conduct that the jury found to be illegal. On the contrary, if "everybody else does it" justifies anything, it justifies the government's undercover investigation into the affairs of the Chicago Board of Trade in the first instance.

As to defendant Schneider, the probation officer reports that he does not admit to any wrongdoing. According to the probation officer's evaluation, Schneider believes he is a victim and that if he had been standing somewhere else in the soybean pit, he would not be where he is today. While that may be true, again as gently as possible, the court wishes to remind Schneider that if he wasn't engaged in the full spectrum of illegal trading practices, he would not be where he is today no matter where in the pit he was standing.

In defendant Ryan's version of the offense, he says "I contend and firmly believe that I have never cheated, deceived or defrauded any customer of the CBOT. While my breaches of rules were wrong, I never violated any rule with the intent to harm or defraud any customer."

Defendant Cox, while acknowledging that he participated in the conduct outlined by the government, does not appear to accept the criminality of his conduct. He continues to assert that no customers got hurt and that "matching", in his opinion, actually helped the customers get better fills.

If these are these six defendants' views, they certainly will not be punished for holding to them. However, these views indicate neither expression of remorse nor cognition of the criminality of their actions. These views would thus preclude these six defendants from receiving the acceptance of responsibility reduction.

*Restitution Calculations*

Each defendant must pay restitution as part of his sentence. The government's restitution calculations equals the amount which Commodities Futures Trading Commissions analysts say each defendant gained from each trade which was the basis for a particular conviction. The government and the defendants agree on the specific calculations which this method yields. Several defendants argue, however, that this method of determining the amount of restitution is improper. These defendants argue that the government has not shown any loss to any customer from which the defendants gained anything. The court disagrees. The government has identified by documentary evidence specific victims, i.e., those customers whose orders these defendants filled in violation of the law and as a result of which they profited illegally.

Having decided the disputed motions and objections, the court makes the following findings as to the appropriate offense levels and criminal history categories, subject to each defendants' exercise of his right to allocution. The court will do so as to each defendant in the order in which they are named in the indictment. No defendant has a prior criminal record and thus all have a Criminal History Category of I.

Pursuant to Guideline § 3D1.2(d), all counts of conviction can be grouped because the offense level from the separate groupings were determined largely on the basis of the total amount of harm or loss, the offense behavior was continuous in nature, and the offense guideline is written to cover such behavior.

The base offense level for a RICO conviction is 19. Since this base offense level is higher than the base offense level for either the mail fraud, wire fraud, or Commodity Exchange Act counts of which these eight defendants were convicted is less than nineteen, the base offense level for all eight RICO defendants is nineteen. For all eight RICO defendants, the base offense level is adjusted upward by two levels under Guideline § 3B1.3 (regarding Abuse of Trust or Use of Special Skill) which raises the offense level to 21. This is the adjusted offense level for defendants Dempsey, Bergstrom, Cox, and Schneider. Defendants Kenney, Ashman, and Vercillo are all entitled to a two-level reduction for

acceptance of responsibility pursuant to Guideline § 3E1.1 which gives them an adjusted offense level of 19. Defendant Fetchenhier is entitled to a two-level reduction pursuant to Guideline § 3B1.2 for being a "minor" participant in the RICO conspiracy. Thus, his adjusted offense level is also 19.

As to defendant Barcal, the base offense level for the nine mail fraud counts of which he was convicted is higher than the base offense level for the Commodity Exchange Act counts of which he was convicted. Thus, the base offense level of 6 for mail fraud applies. That base offense level is adjusted upward by one level pursuant to Guideline § 2F1.1(b)(1)(B) due to amount of loss, by two levels pursuant to Guideline § 2F1.1(b)(2) for more than minimal planning (an adjustment to which Barcal does not object), and by two levels pursuant to Guideline § 3B1.3 for use of a special skill. This yields an adjusted offense level of 11. There is no upward adjustment for multiple counts.

As to defendant Ryan, the base offense levels for the wire fraud count of which he was convicted and for the Commodity Exchange Act counts of which he was convicted are both 6. That base offense level is adjusted upward by two levels pursuant to Guideline § 2F1.1(b)(2) for more than minimal planning (an adjustment to which Ryan does not object), upward by two levels pursuant to Guideline § 3B1.3 for use of a special skill, and downward by two levels pursuant to Guideline § 3B1.2 for being a "minor" participant in the wire fraud scheme. This yields an adjusted offense level of 8.

In addition to imposing a period of incarceration within the applicable guideline range, Guideline § 5E1.1(a) provides that "the court shall order restitution for convictions under Title 18 of the United States Code ... in accordance with 18 U.S.C. § 3663(d)." The court has already rejected defendants' objection to the method by which the restitution amounts were calculated. Defendants agree, however, that the government's calculations pursuant to

that method are accurate. These amounts are as follows:

| | |
|---|---|
| Dempsey | $ 78,087.50 |
| Bergstrom | $ 9,368.75 |
| Ashman | $ 3,200.00 |
| Barcal | $ 1,662.51 |
| Cox | $ 15,250.00 |
| Kenney | $ 5,310.42 |
| Ryan | $ 325.00 |
| Fetchenhier | $ 1250.00 |
| Schneider | $ 2475.32 |

In addition to any other penalties imposed on the defendants, the court orders that they make restitution in those amounts to the victims as identified by the government's documents in the specific counts of conviction.

In addition to imposing a period of incarceration within the applicable guideline range and ordering restitution, Guideline § 5E1.2(c)(3) prescribes a range of fines for each base offense level under the guidelines. The minimum fine is the greater of the minimum fine prescribed in Guideline § 5E1.2(c)(3) and the "pecuniary gain to the defendant, less restitution made or ordered." Guideline § 5E1.2(c)(1)(A), (B). The court must impose a fine within the applicable range unless it finds that a particular defendant is unable to pay such fine. Guideline § 5E1.2(a), (f). In determining ability to pay, the court has analyzed each defendant's net worth figure taking into account with respect to the eight RICO defendants, the amount of forfeiture which these defendants have either agreed to pay or which the court has ordered them to pay. The forfeiture figures are as follows:

| | |
|---|---|
| Dempsey | $ 300,000.00 |
| Bergstrom | $ 300,000.00 |
| Ashman | $ 3,200.00 |
| Cox | $ 150,000.00 |
| Kenney | $ 5,310.42 |
| Fetchenhier | $ 150,000.00 |
| Schneider | $ 150,000.00 |

The court concludes based on its analysis of defendants' financial statements that the following defendants are unable to pay a fine because they have either a negative monthly cash flow or a negative net worth after payment of forfeitures and restitution: Dempsey, Ashman, Barcal, Cox, Kenney, and Schneider. As to defendants

Bergstrom and Fetchenhier, the court levies a fine of $10,000. As to John Ryan, the court levies a fine of $1,000 (which includes a fine for the non-guideline counts).

The guidelines also provide that the court must assess to the defendants an additional fine sufficient to cover the costs of their incarceration unless they are unable to pay such an additional fine or such an additional fine would impose an undue burden upon their families. Guideline § 5E1.2(f), (i). Given the limited finances of all defendants after this trial and the hardships already imposed upon their families, it is the conclusion of this court that as to all defendants, the assessment of an additional fine to cover the costs of their incarceration would cause an undue hardship on their families. Accordingly, the court declines to assess costs of incarceration as to any defendant.

The defendants are also subject to the following statutorily-mandated special assessments of $50 per felony conviction and $25 per misdemeanor conviction. See Guideline § 5E1.3. These amounts are as follows:

| | | |
|---|---|---|
| Dempsey: | 52 felonies + 9 misdemeanors | = $2825 |
| Bergstrom: | 21 felonies + 25 misdemeanors | = $1675 |
| Ashman: | 17 felonies + 2 misdemeanors | = $ 900 |
| Barcal: | 23 felonies + 1 misdemeanor | = $1175 |
| Cox: | 41 felonies + 10 misdemeanors | = $2550 |
| Kenney: | 17 felonies + 2 misdemeanors | = $ 900 |
| Ryan: | 4 felonies + 1 misdemeanor | = $ 225 |
| Fetchenhier: | 4 felonies + 3 misdemeanors | = $ 275 |
| Schneider: | 26 felonies + 10 misdemeanors | = $1550 |

The court hereby orders defendant to pay these special assessments as part of their sentences.