**Diane MATTES, d/b/a Diane Mattes Livestock, Philip Mattes, Jr., and Mattes Livestock Auction Market, Inc., Petitioners,**

v.

**UNITED STATES of America and United States Department of Agriculture, Respondents.**

No. 83–1339.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1983.

Decided Nov. 23, 1983.

As Amended Nov. 23, 1983.

1126

Gerard D. Eftink, Deas, Van Hosser & Olsen, Kansas City, Mo., for petitioners.

Virginia Strasser, U.S. Dept. of Agriculture, Washington, D.C., for respondents.

Before PELL and CUDAHY, Circuit Judges, and GRANT, Senior District Judge.*

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

CUDAHY, Circuit Judge.

This matter comes before us on a petition for review of a decision by respondent United States Department of Agriculture (the "USDA") denying registration under the Packers & Stockyards Act, (the "Act"), 7 U.S.C. §§ 181 et seq., to petitioner Diane Mattes ("Diane") to operate a stockyard.[1] The USDA denied Diane's application for registration under the Act on the ground that the business she proposed to operate would have the effect of circumventing the suspensions agreed to by her husband Philip Mattes, Jr. ("Philip Jr.") and Mattes Livestock Auction Market, Inc. (the "Corporation") of which Philip is a fifty percent shareholder. Diane claims that the USDA is without authority to deny her registration unless she does not meet the standards set out in the Act and the regulations under it. Because we find both substantial evidence to support a finding that Diane's registration would circumvent the prior suspension order, and power in the USDA to prevent such circumvention, we affirm.

### I. Background

The events which led to this litigation began in 1974 when Philip Mattes, Sr. (Diane's father-in-law) and the Corporation were charged with violating § 312(a) of the Act, 7 U.S.C. § 213(a) (1976), by misusing funds in a custodial account. This dispute was concluded when the USDA and the parties consented to a cease and desist order and the accounts were replenished. See In re Mattes Livestock Auction Market, Inc. and Philip Mattes, Sr., 33 Ag.Dec. 643 (1974).

In 1981 Philip Jr., Philip Sr. and the Corporation were charged with violating the 1974 cease and desist order by continuing to misuse the corporate custodial account. Once again, the parties agreed to a cease and desist order, which this time provided for suspension of the Corporation's registration for twenty-one days and for suspension of Philip Jr.'s registration for sixty days.

Meanwhile, in July, 1981, six weeks after the second complaint was filed against her husband, her father-in-law and the Corporation, Diane applied for and received licenses from the Wisconsin State Department of Agriculture. She made no use of those licenses until April, 1982, when she applied for registration under the Act as a market agency to operate a stockyard under the name "Diane Mattes Livestock." Although she had never engaged in the business before, she apparently proposed to lease the stockyard from the Corporation and to operate a livestock business completely independent of Philip Jr., at least during the period of his suspension. Diane was informed by letter that the USDA's initial decision was to deny her application for registration because it believed the plan was an attempt to circumvent the suspension orders entered against the Corporation and Philip Jr. Diane was also informed that a hearing would be held later for final determination of her application.

The hearing on Diane's application was held in June, 1982. Between the initial denial of her application and the hearing, she took several steps to prepare to commence business, including entry into a lease of the premises with the Corporation,[2] establishment of the required custodial bank accounts and examination of the books and records of the Corporation. The lease had a one year term but was terminable by either party for any reason on fifteen days' notice. At the hearing she testified that she planned to operate with the same staff and that she planned on "operating in the same mode" as the Corporation. Tr. at 113–14.

The USDA argues that it would circumvent the effect of the suspension orders if, immediately upon the suspensions taking effect, Diane were to open a market agency at the same place, using the same facility, with the same employees and with the same

---

1. The statutes and regulations concerning the requirements for registration under the Act are found at 7 U.S.C. § 203 and 9 C.F.R. 201.10.

2. The lease between Diane and the Corporation was executed on May 19, 1982 to commence thirty-three days earlier, on April 16, 1982. The record contains no explanation for this pre-dating.

method of operation as the suspended corporation. Essentially, the deterrent effect of the suspensions would be diminished, if not altogether eliminated, because the goodwill of the Corporation would be transferred to and preserved by Diane.[3] Diane's testimony reflects a desire to maintain continuity in the business despite the suspensions. Tr. at 113, 109.

At the hearing, much of the testimony focused on Diane's intent vis-a-vis the suspended corporation and her husband. A government witness testified that Diane told him that her intent was to circumvent the order. Diane testified, not surprisingly, that she only intended to start her own business and she intended to operate completely independent from her husband. Administrative Law Judge ("ALJ") Dorothea Baker determined that Diane was a more credible witness than the government witness and found that Diane's intention was to operate the business herself for at least the year that the lease provided. The ALJ concluded that because, in her view, Diane did not intend to circumvent the suspension order, the USDA lacked the authority to refuse her registration since she met all the requirements of the Act and regulations, 9 C.F.R. 201.10. The ALJ therefore ordered the USDA to register Diane "as a market agency and dealer to buy and sell livestock in commerce...."

The USDA appealed to a Judicial Officer ("J.O.") who reversed the decision of the ALJ. J.O. Donald A. Campbell took a different approach to the case than the ALJ, relying more on the facts and circumstances surrounding Diane's application and less on her expressed intention. While the J.O. seems to have disagreed with the ALJ on certain credibility determinations, he made it clear that he was basing his reversal on the undisputed circumstances in the record. J.O.'s Dec. at 22. Thus the J.O. inferred from the "uncontradicted, objective circumstances" that Diane's plan was an attempt to circumvent the order suspending her husband and the Corporation. J.O.'s Dec. at 21.[4] He therefore denied her application "until the 21-day period of suspension imposed upon Mattes Livestock Auction Market, Inc., has become effective and has expired." J.O.'s Dec. at 52.

Diane petitioned this court to review the decision of the J.O. She challenges the USDA's authority to deny her application upon the circumvention ground because, admittedly, she meets all of the published requirements for registration. She also attacks the J.O.'s rejection of the ALJ's findings and claims that the J.O.'s decision was the product of bias resulting from his former performance of operating functions within the USDA. Jurisdiction of the petition for review is proper under 28 U.S.C. § 2341.

## II. *Circumvention*

The most difficult issue presented by this case is whether the USDA may refuse to register Diane in order to prevent circumvention of the suspension orders against the Corporation and Philip Jr. In short, the reason Diane's proposed business might circumvent the suspension order is that the goodwill of the Corporation could simply be maintained through her and transferred back to the Corporation when its suspension ended. This, combined with the fact that her husband would share in whatever economic benefit accrued during the twenty-one day suspension, would completely frustrate the effect of the suspensions. Before discussing the legal issue, however, we will review the evidence supporting the finding that Diane's plan would result in circumvention. This review may help to illustrate the importance of the suspension power to the administration of the Packers and Stockyards Act.

### A. *Substantial Evidence Review*

■ Our review of the factual findings made by the Secretary of Agriculture is

---

**3.** The USDA maintains a policy of severe sanctions, including suspensions, in order to deter violations of the Act. *See In re Mid-States Livestock, Inc.*, 37 Ag.Dec. 547, 549 (1977),

*aff'd sub nom. Van Wyck v. Bergland,* 570 F.2d 701 (8th Cir.1978).

**4.** The specific facts relied upon by the J.O. are set out at Part II–A *infra*.

narrow. The Secretary's findings must·be sustained if they are supported by substantial evidence which is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]' " *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) *quoting Consolidated Edison v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938), *quoted in NLRB v. Berger Transfer and Storage Co.,* 678 F.2d 679, 687 (7th Cir.1982). *See also Swift & Co. v. United States,* 393 F.2d 247, 255 (7th Cir.1968).

■ Despite Diane's arguments to the contrary, the J.O. is not required to accept the ALJ's findings of fact even when those findings are based on credibility determinations. Administrative Procedure Act ("APA") § 557(b), 5 U.S.C. § 557(b). Rather, as the Supreme Court made clear in *Universal Camera,* the agency is free to substitute its judgment for that of the ALJ. The reviewing court still evaluates the J.O.'s decision using the substantial evidence test with the caveat that "evidence supporting a conclusion may be less substantial when an impartial, experienced [ALJ] who has observed the witness and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951). *See also Kopack v. NLRB,* 668 F.2d 946, 951–52 (7th Cir.1982).

Thus the ALJ's determinations are not entitled to any special deference from the agency except insofar as the ALJ's findings are based on witness credibility determinations. The agency is free independently to weigh the evidence and draw its own inferences. The ALJ, of course, is best situated to make credibility determinations based on the demeanor of witnesses. *Kopack,* 668 F.2d at 953.[5] *See generally* 3 K.C. DAVIS, ADMINISTRATIVE LAW TREATISE 327–36 (2d ed. 1980).

The ALJ, finding Diane a credible witness, accepted Diane's statements that she intended to operate independently and did not intend to circumvent the suspension orders. The J.O., without explicitly rejecting the ALJ's findings, reversed on the facts holding "the uncontradicted, objective circumstances [to be] more persuasive than Mrs. Mattes' testimony." J.O.'s Dec. at 21. The J.O. thus inferred from a number of facts and circumstances that Diane's application for registration was part of an attempt to avoid the effects of the suspension.[6]

■ Looking at the proof on both sides, we conclude that substantial evidence supports the finding that Diane's plan was an attempt to circumvent the suspension order. The J.O. drew this inference from the following factors: the marital relationship between Diane and Philip Jr. (a suspended registrant and fifty percent shareholder in the suspended Corporation); the terms of the lease of the Corporate facilities (especially the fifteen day termination clause and the absence of a renewal option); the failure of Philip Jr. and Sr. to testify; the timing of Diane's application; her lack of prior experience; her intention to use the Corporation's employees and tariff; her "admission of circumvention"; the timing of her examination of the corporate books and financial statement; and her intent at first to use the Corporation's bank accounts.

---

**5.** Some inferences are based on credibility of witnesses and some are based purely on objective facts. The J.O. is free to draw his or her own inferences when they are not based on demeanor as long as those inferences are supported by substantial evidence. *Kopack,* 668 F.2d at 953.

**6.** The different approaches to the case taken by the ALJ and J.O. may, to some extent, revolve around the meaning of "circumvent." "Circumvent" may, in certain contexts, imply a scheme or strategy of avoidance. Thus, the ALJ may have thought that Diane's intent was dispositive. In other contexts however, "circumvent" may simply mean something having the effect of avoiding or frustrating. *See* Webster's New International Dictionary (2d ed. 1958). In our view, this definitional problem is irrelevant here because the evidence supports the J.O.'s finding under either definition of "circumvention."

The J.O.'s reliance on the "admission of circumvention" indicates that he rejected the ALJ's finding that the government's witness on this point lacked credibility.[7] If this were a close case, we might hesitate to approve the unexplained reversal of a credibility determination by an officer who has not had the opportunity to observe the witnesses. Similarly, by inferring from the circumstances noted above that Diane was involved in a plan to circumvent the suspensions, the J.O. might be deemed to have implicitly rejected the ALJ's finding that Diane was telling the truth. Thus we consider the ALJ's credibility determinations and the findings based on them to be factors weighing against the government's position in accordance with *Universal Camera*.[8] Nonetheless, there is no doubt that a reasonable person, confronted with this record, could find that Diane was involved in a plan (perhaps unwittingly) to avoid the effect of the suspension orders. The factors cited by the J.O., regardless of any credibility disagreements, unmistakably point to a circumvention of the suspension order.

The most striking fact in this balance is the lease entered into by Diane and the Corporation. The lease reserves to both parties the power to terminate on fifteen days' notice for any reason. It is perfectly reasonable to infer from this provision a scheme to use Diane as a substitute for as brief a time as possible. Whether Diane viewed it that way is irrelevant because the Corporation and Philip Jr. could have advocated the clause without telling her why it was important.[9] At oral argument, Diane's counsel could not explain what benefit Diane could derive from the termination clause.

The lease also lacked a renewal option, which implies that Diane was not interested in pursuing a long-term business. It is reasonable to infer from the terms of the lease that Diane intended, or at least would be in a position, to establish a business of her own only so long as necessary to avoid the effects of the suspensions.

The remaining factors listed by the J.O., with one exception, need no explanation of why they support his conclusion. That exception is the failure of Philip Sr. and Philip Jr. to testify. It is sometimes a tricky business to judge the importance of the failure of a person to testify. In this case, however, Philip Sr. and Philip Jr.'s intentions regarding the duration of the lease, the termination clause and the lack of a renewal option were of special importance. If they had satisfactorily explained those provisions (or perhaps even agreed to modify them) the J.O. might have been presented with a significantly different case. We agree with the J.O. that, when a party fails to produce a witness potentially vital to her case, such a failure supports an inference that the testimony would have been adverse. *See* J.O.'s Dec. at 30–31.

In sum, the evidentiary findings of the J.O. are amply supported by the record. The inferences made by the J.O. are perfectly reasonable. Further, we note that, in accord with *Kopack,* the fact that the ALJ drew different (or no) inferences from these facts is of little importance to our review because those inferences were not "demeanor based." *See* n. 9 *supra* and *Kopack,* 668 F.2d at 954–55. Even apart from the factors enumerated above, there are several other matters in the record which constitute

---

7. Dwayne Brander, a Wisconsin Department of Agriculture official, testified that Diane told him that her application was "a circumvention" and that, if he told anyone else what she had said, she would deny it. Tr. at 132–33. The ALJ apparently did not believe Mr. Brander, characterizing the testimony as "less trustworthy and persuasive than the testimony of Mrs. Mattes." ALJ's Dec. at 18.

8. We also consider the mere fact that the ALJ ruled in Diane's favor as evidence against the agency here. *See Universal Camera,* 340 U.S.

at 496–97, 71 S.Ct. at 468–69. However, that fact does not change our finding that substantial evidence supports the agency's conclusion.

9. From the record, it appears that Diane may have been surprised when confronted at the hearing with the fifteen day clause. This would highlight her lack of experience in business matters and lend credence to the proposition that she was an unwitting participant in a circumvention scheme.

substantial evidence supporting the decision.[10]

### B. *Legal Authority*

The USDA contends that implicit in its power to suspend registrants is the power to deny registration when such a denial is necessary to prevent circumvention of a suspension order. Diane rejects this contention pointing out that the Packers and Stockyards Act requires operators of regulated stockyards to register "with the Secretary [of Agriculture] under such rules and regulations as the Secretary may prescribe." 7 U.S.C. § 203. The regulation prescribing the standards for acceptance of registration applications, 9 C.F.R. 201.10, does not mention circumvention of suspension orders as grounds for denial of registration. Therefore, contends Diane, the USDA lacks legal authority to refuse her registration.

The USDA admits that Diane meets all of the requirements for registration to be found in the statute and regulations. However the USDA points to certain of its past decisions in which entities and people have been precluded from operating because of potential circumvention of agency orders.[11] Further, the Judicial Officer notes in his opinion that "[i]n every case except for the present, the applicant for registration, who was refused registration during the period of a suspension order, acquiesced in the administrative decision." J.O.'s Dec. at 47. This implies that the USDA follows a practice of denying registration where necessary to prevent circumvention of suspension orders. But we have been unable to find a reported case where registration was refused to someone who was not a party to prior proceedings and not a participant in earlier violations of the Act. Therefore, we consider this a somewhat novel question.

Initially we reject Diane's argument that registration may only be denied for the reasons enumerated in the statute and regulations. Certainly the statute does not require such an interpretation. Further, we do not read § 203(2) as abrogating the general principle that agencies are free, within the limits of statutory authority, to proceed either through general rules or through individual adjudications. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); *Securities and Exchange Comm'n v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).

The ease with which Diane's plan might have frustrated the Secretary's effort to impose sanctions on the Corporation and Philip Jr. illustrates the importance of the ability to prevent circumventions. We do not believe that by using the phrase "under such rules and regulations as the Secretary may prescribe" in § 203, Congress intended to deprive the USDA of the power to meet all contingencies, even if unanticipated. In granting the suspension power, Congress must have intended to include power to make suspensions effective.

The USDA has frequently acted to prevent manipulation of corporate structures to circumvent suspension orders. Often, suspended registrants reorganize or form new corporate entities and attempt to operate through those entities during a suspension. *See, e.g., In re Townsend,* 35 Ag.Dec. 1604 (1976). In *Townsend,* the suspended registrant leased his facilities to a new corporate entity owned by the bookkeeper of the former business. The USDA added the new corporation as a respondent and ordered it to refrain from doing business during the time the original operator was sus-

---

**10.** For example, during her testimony Diane referred to "our customers" and "our business." These references support the inference that Diane was attempting to keep the family business alive during the suspension. This, of course, would have amounted to circumvention.

**11.** In one case, a suspended registrant was allowed to lease his premises to his son. *In re*

*Loretz,* 36 Ag.Dec. 1087 (1977). The USDA acknowledges that the instant case might be inconsistent with *Loretz* and to the extent that it is, the Department asks us to consider *Loretz* an aberration. *Loretz* is distinguishable, but even if it were not, the USDA would not be bound by an arguably mistaken precedent on which no one could reasonably rely.

pended. We find the situation in *Townsend* analogous to the one presented here. We also note that the USDA's practice of looking through corporate entities in order to effectuate the remedial goals of the Act has been approved by other circuits. *See, e.g., Bruhn's Freezer Meats v. USDA*, 438 F.2d 1332, 1343 (8th Cir.1971).

But this case differs from *Bruhn* and other similar cases in two respects. Diane was not made a party to the original proceedings and there is no allegation that she participated in the conduct which led to the suspensions. While it might have been "neater" to include Diane originally as a respondent, there is nothing in the Act which precludes, or even casts doubt upon, the procedure employed by the USDA in this case. Failure to include Diane in earlier phases of the case is immaterial.

First, the fact that Diane was not a party to the original proceedings did not prejudice her. She has been afforded a full hearing on her application and has availed herself of the opportunity for judicial review. In fact, the parties to this petition have shown flexibility in adapting normal procedures to new exigencies.

Second, Diane's lack of participation in the violations of the Act is irrelevant to whether her registration is an attempt to circumvent the suspension order. Her proposal alone is crucial and is, in itself, a cause for concern. If she were allowed to operate as proposed, the negative impacts of the suspensions might be entirely dissipated. Obviously, to protect its authority, the USDA must be able to insure that suspensions remain as onerous as designed. We conclude that the suspension power by necessary implication incorporates the authority to proceed against circumvention even in the absence of a specific rule on the subject.

### III. *Bias*

■ Diane claims that the J.O.'s decision must be reversed because it was the product of bias resulting from his years of experience as an official of the Packers and Stockyards Administration. In support of this contention she cites passages from the J.O.'s opinion in which he discusses agency policy, known to him as a USDA officer, precluding the lease of a suspended registrant's facilities, especially where the lease would result in circumvention of a suspension order. J.O.'s Dec. at 2 n. 2, 46–47. Diane also asserts that bias is the only explanation for the J.O.'s drawing an adverse influence from the failure of Philip Jr. or Philip Sr. to testify about whether they intended to take advantage of the fifteen day termination clause in the lease.

We find no merit in this serious charge. The opinion contains a thorough explanation of USDA policy regarding the leasing of a suspended registrant's premises. The J.O. did not say, as Diane asserts in her brief, that "he always believes 'circumvention' can be found." Pet. Brief. at 18. Rather, he said that in every case in which he had been involved as an officer of the agency, after "all of the relevant facts and circumstances were examined . . . it was determined that the applicants for registration were engaged in a scheme, along with the suspended registrants, to circumvent a suspension order." J.O.'s Dec. at 46. Nothing in any statement contained in the J.O.'s opinion indicates that he prejudged the case. The thoroughness of the opinion, and especially his discussion of the factual circumstances surrounding Diane's application, indicate quite the opposite.

One of the main reasons for the existence of specialized agencies like the USDA is to provide expert administrators for the enforcement of regulatory statutes. Here, the J.O. brought his many years of experience in the agency to bear on his decision. While he did express his views on matters of agency policy, "a complete *tabula rasa* . . ." in the area of agency policy "would be evidence of lack of qualification not lack of bias." *Laird v. Tatum*, 409 U.S. 824, 835, 93 S.Ct. 7, 14, 34 L.Ed.2d 50 (1972) (Memorandum of Justice Rehnquist on motion that he disqualify himself from participation in a case). *See also United Steelworkers of America v. Marshall*, 647 F.2d 1189 (D.C.Cir. 1980), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). We see noth-

ing in the record which even suggests to us that the J.O. did not discharge his duties in a conscientious and impartial manner. *Cf. Faultless Division v. Secretary of Labor,* 674 F.2d 1177, 1183 (7th Cir.1982) (mere familiarity with issues does not evince bias).

### IV. *Less "Oppressive" Measures*

█ Diane's final argument is that the J.O. failed to note less oppressive measures which could have prevented circumvention. Her argument fails for two reasons. First, we see no legal requirement that the agency employ the least oppressive measures available. On this point, the only authority Diane cites is *Greene v. Sinclair,* 491 F.Supp. 19 (W.D.Mich.1980), a case involving the "least restrictive alternative" doctrine with regard to discretionary licensing affecting *first amendment* interests. That doctrine is inapposite to licensing under the Packers and Stockyards Act, at least in the usual case. The "least restrictive alternative" doctrine is not a limit on the agency's broad discretion in formulating sanctions where no first amendment or analogous interests are involved. Denying Diane's registration during the Corporation's suspension is well within that discretion. *See* Part II–B *supra.*

In any event, the less oppressive measures Diane would have the USDA adopt miss the point. She urges that the USDA could carefully monitor her operations to ensure that Philip Jr. was not operating the stockyard while he was suspended. Such monitoring would, of course, address a violation of the suspension, not a circumvention. She fails to recognize that the mere fact that a Mattes is operating the very same stockyard during the suspension, in an uninterrupted fashion, undermines the economic effect of the suspensions and tends to nullify their deterrent effect.

We acknowledge that Diane has a legitimate interest in pursuing a livelihood. Certainly, the USDA cannot prevent her from

earning an income merely because the Corporation and her husband are suspended. However, there is no indication that an application for registration from Diane which did not threaten to circumvent the suspension order would have been denied.

### V.

Therefore, the decision of the USDA is affirmed.