**John H. RYAN, Petitioner,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

**No. 97–2120.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1998.

Decided May 21, 1998.

Gordon B. Nash, Jr. (argued), Scott M. Murray, Gardner, Carton & Douglas, Chicago, IL, for Petitioner.

J. Douglas Richards (argued), Gracemary Rizzo, Commodity Futures Trading Commission, Office of the General Counsel, Washington, DC, Dennis M. Robb, Commodity Futures Trading Commission, Chicago, IL, Elisse B. Walker, Commodity Futures Trading Commission, Office of the General Counsel, Washington, DC, for Respondent.

Before CUMMINGS, CUDAHY, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

John H. Ryan petitions for review of a final order of the Commodity Futures Trading Commission ("Commission") entered in April 1997, which denied his floor trading registration application and barred him from trading in any market regulated by the Commission for six years. Because this administrative sanction followed a criminal sentence for the same conduct, Ryan claims the Commission's order violates the Double Jeopardy Clause of the Fifth Amendment. Ryan also challenges the imposition of the trading ban on the ground that the Commission abused its discretion by failing to follow precedent, by failing to defer to an ALJ's credibility determinations, by refusing to consider how a conditional registration would impact Ryan's application, by incorporating irrelevant factors into its analysis, and by failing to give appropriate weight to evidence that mit-

igated his wrongdoing and showed his rehabilitation. Finally, Ryan appeals to equity and asks us to use our discretion to limit the Commission's power to impose sanctions on him.

Because we reject Ryan's claims, we affirm the Commission's order.

## I. HISTORY

### A.

In August 1989, Ryan was indicted together with eighteen other soybean traders and a clerk from the Chicago Board of Trade ("CBOT") as the result of an FBI sting operation in the soybean futures pit of the CBOT. *See United States v. Ashman*, 979 F.2d 469 (7th Cir.1992); *United States v. Dempsey*, 768 F.Supp. 1256 (N.D.Ill.1990). The indictment charged hundreds of statutory violations, including violations of the mail and wire fraud statutes and the Commodity Exchange Act ("Act").[1] *See Dempsey*, 768 F.Supp. at 1260. Ryan was not implicated in the vast majority of these charges. *See id.*

After a three-month jury trial, Ryan was convicted of 1) entering into a prearranged accommodation trade in violation of § 4c(a)(A) of the Act, 7 U.S.C. § 6c(a)(3)(A); 2) aiding and abetting another trader in offsetting orders in violation of § 4d(D) of the Act, 7 U.S.C. § 6b(1)(D); 3) filling customer orders by offset in violation of § 4d(D) of the

Act, 7 U.S.C. § 6b(1)(D); and 4) entering a false trading record in violation of § 4b(B) of the Act, 7 U.S.C. § 6b(1)(B). Ryan was also convicted of one violation of the wire fraud statute. The district court found Ryan was a minor participant in the wrongdoing and sentenced him to three years of probation and two months of home detention. *See United States v. Dempsey*, 768 F.Supp. 1277, 1285 (N.D.Ill.1991). The court also fined Ryan $1,000 and ordered him to pay $325 in restitution and $225 in a special assessment. *See id.* at 1291–92.

Four incidents comprise Ryan's wrongdoing. On June 8, 1987, Ryan and David Skrodzki engaged in two prearranged trades for November 1987 soybeans for their personal accounts; no customer orders were involved. Skrodzki received a profit of $175, the amount Ryan owed him for a profitable out trade[2] resulting from trading on the previous day.

Two incidents involved customers' market-on-close orders.[3] On September 8, 1987, Bruce Mittelstadt, a floor broker,[4] matched three customers' marketon-close orders for November 1987 soybeans with Ryan, who acted as a floor trader.[5] On November 24, 1987, acting as a floor broker, Ryan matched two customers' market-on-close orders for January 1988 soybeans with FBI undercover

---

1. Congress redesignated and amended in part the Act by the Futures Trading Practices Act of 1992, Pub. L. No. 102–546, 106 Stat. 3590(b) ("FTPA"). Certain sections of the Act, including § 6(b), were redesignated by the FTPA. Because the proceeding below was conducted exclusively under the Act as it existed before the FTPA's enactment, this opinion refers to the Act's provisions by their pre-FTPA designations.

2. An out trade is "[a] trade which cannot be cleared by a clearinghouse because the trade data submitted by the two clearing members involved in the trade differs in some respect (e.g., price and/or quantity). In such cases, the two clearing members or brokers involved must reconcile the discrepancy, if possible, and resubmit the trade for clearing. If an agreement cannot be reached by the two clearing members or brokers involved, the dispute would be settled by an appropriate exchange committee." The C.F.T.C. Glossary: A Layman's Guide to the Language of the Futures Industry 44–45 (C.F.T.C. Jan. 1997) (hereinafter "C.F.T.C. Glossary").

3. A market-on-close order is an order "to buy or sell at the end of the trading session at a price within the closing range of prices." C.F.T.C. Glossary at 40.

4. A floor broker is "any person who, in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged, purchases or sells for any other person any commodity for future delivery on or subject to the rules of any contract market." 7 U.S.C. § 1a(8).

5. A floor trader is "any person who, in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged, purchases or sells solely for such person's own account, any commodity for future delivery on or subject to the rules of any contract market." 7 U.S.C. § 1a(9).

agent Richard Ostrom, who was acting as a floor trader.

In each case, Ryan designated the orders as having been filled during regular trading hours even though the trades were executed shortly after the market closed. In both transactions, the customers' orders were filled at prices within the closing range. Ryan received a profit of $25 in the first transaction. Ostrom received a profit of $25 and Ryan earned a total commission of $2.50 for his participation in the second transaction.

Finally, on May 5, 1988, Ryan, acting as a floor trader, and James Nowak, a floor broker, engaged in a prearranged trade involving a customer's market order [6] for November 1988 soybeans. Relying on Nowak's advice, Ryan had established a long position beforehand. Nowak then bought 50 contracts for Merrill Lynch from Ryan at 5.17 when the market price was 5.16. Ryan earned a profit of $900, which represented the amount Nowak owed Ryan for previously absorbing a losing out trade.

### B.

In June 1991, the Enforcement Division of the Commission ("Division") filed a five-count complaint against Ryan ("First Complaint"). Counts I through IV reflected the charges on which Ryan was already convicted. The Division sought a cease and desist order, a trading prohibition, and a civil monetary penalty as sanctions for Ryan's wrongdoing. Count V alleged that Ryan was statutorily disqualified from registration under §§ 8a(2)(D) and 8a(2)(E) of the Act, 7 U.S.C. §§ 12a(2)(D), 12a(2)(E), by virtue of his felony and misdemeanor convictions. This count sought revocation of Ryan's floor broker registration.

In his answer to the complaint, Ryan admitted his criminal convictions but denied the allegations describing the underlying actions. He also raised three affirmative defenses, one of which argued that a civil sanction would violate the Double Jeopardy Clause of the Fifth Amendment.

In July 1991, after a hearing on the fifth count, the ALJ found that Ryan was subject to statutory disqualification. It suspended his floor broker registration for six months and ordered him to show cause why his registration should not be revoked. In October 1991, after considering Ryan's response and the Division's reply, the ALJ revoked Ryan's registration. Ryan has not appealed this decision.

The Division moved for summary disposition on counts I through IV in November 1991. The ALJ granted this motion and ordered the parties to file briefs on the issue of sanctions. In February 1992, the ALJ conducted a one-day hearing. In December 1992, the ALJ found the cease and desist order appropriate and ordered a ninety-day trading ban. *See In re Ryan*, [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 25,632 at 40,019, No. 9110, 1992 WL 379245, at *6 (ALJ Dec. 16, 1992) ("*ALJ I*"). The ALJ justified this short ban as sufficient to protect the public interest in light of Ryan's minor culpability. *See id.*

The Division appealed the limited duration of the trading prohibition to the Commission. On appeal, the Commission found that under § 9(b) of the Act, 7 U.S.C. § 13(b),[7] Ryan's conviction raised a presumption that he should be banned from trading for between six and ten years. *See In re Ryan*, [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 25,832, No. 91–10, 1993 WL

---

**6.** A market order is "[a]n order to buy or sell a futures contract at whatever price is obtainable at the time it is entered in the ring or pit." C.F.T.C. Glossary at 40.

**7.** At the time this case was commenced, § 9(b) of the Act provided that it was a felony to knowingly violate several other provisions of the Act, including § 4b. It further stated that:

Any person convicted of a felony under this section shall be ... barred from using or participating in any manner in any market regulated by the Commission for five years or such longer period as the Commission may determine, on such terms and conditions as the Commission shall prescribe, unless the Commission determines that the imposition of such ... market bar is not required to protect the public interest. The Commission may upon petition later review such ... market bar and for good cause shown reduce the period thereof.

7 U.S.C. § 13(b).

316031, at *3–*5 (C.F.T.C. Aug. 13, 1993) ("*Ryan I*"). The Commission remanded the case to the ALJ to allow the parties to supplement the record in accordance with its guidance on the proper application of § 9(b). *See id.* at *5.

### C.

As the proceedings were pending on the First Complaint, Ryan applied for registration as a floor trader.[8] In response, the Division instituted a new proceeding in July 1993 to assess whether Ryan's application for floor trader registration should be denied in light of his felony convictions ("Second Complaint").

In August 1993, the ALJ determined that Ryan was subject to statutory disqualification from registration under §§ 8a(2)(D) and (E) of the Act. The ALJ suspended Ryan's no-action status and directed him to show cause why his application for registration should not be denied.

The ALJ then conducted a hearing in January 1994. The parties agreed that this hearing on the allegations raised in the Second Complaint would also serve as the record for the ALJ's decision on remand for the allegations raised in the First Complaint. In addition, they agreed that the ALJ could consider the testimony offered in the February 1992 hearing on the First Complaint as part of the hearing record for both proceedings.

The ALJ issued a second order in April 1994. *See In re Ryan*, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 26,053, Nos. 91–10 & SD 93–17, 1994 WL 130024 (ALJ April 14, 1994) ("*ALJ II*"). Finding that Ryan had rebutted the presumption that he should be banned from all markets for six to ten years, the ALJ granted Ryan's floor trader application and denied the Division's request for the imposition of a trading prohibition. *See id.* at *6–*7. The Division appealed to the Commission, chal-

lenging the ALJ's analysis as unsupported by the record and inconsistent with the Commission's precedent establishing guidelines for assessing these sanctions.

### D.

On April 25, 1997, the Commission issued a final order denying Ryan's application for registration as a floor trader and barring him from trading on Commission-regulated markets for six years. *See In re Ryan*, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 27,049, Nos. 91–10 & SD 93–17, 1997 WL 208881 (C.F.T.C. April 25, 1997) ("*Ryan II*"). In rejecting Ryan's claims of mitigation, the Commission found Ryan's contention that he had not intended to harm customers to be inconsistent with the jury's findings in the criminal case and his remaining arguments about confusion about the legality of his conduct and widespread wrongdoing by other traders to be unpersuasive. *See id.* at *9. Also, the Commission cited Ryan's misdemeanor conviction for engaging in noncompetitive transactions and admissions of noncompetitive trading on other occasions as evidence that Ryan engaged in repeated illegal practices. *See id.* at *10. It rejected Ryan's contention that his role and the total size of his gains undercut the fact that he engaged in a number of serious criminal acts on the floor of the exchange. *See id.* Thus, the Commission concluded that Ryan failed to produce significant evidence to mitigate the seriousness of his wrongdoing and that a pattern of illegal behavior strengthened the presumption in this case. *See id.*

With respect to rehabilitation, the Commission was not persuaded by Ryan's argument that he clearly changed his behavior since the time he committed the illegal actions. *See id.* It gave limited weight to Ryan's expressed contrition, claiming it did not establish a change in direction. Moreover, the Commission concluded that, by fail-

---

8. Prior to the enactment of the FTPA, floor traders were not required to be registered. In implementing the FTPA's requirement that floor traders register, the Commission adopted "no-action" positions which permitted certain individuals with exchange trading privileges to con- tinue to act as floor traders while their applications for registration were being processed. *See* 58 Fed.Reg. 21767 (Apr. 23, 1993); 58 Fed.Reg. 19,575 (Apr. 15, 1993); *see also* 17 C.F.R. § 1.66 (1996).

ing to accept responsibility for his actions during his criminal trial and by continuing to assert before the ALJ that his misconduct did not harm any customers, Ryan had "not even taken the important first step on the path of rehabilitation." *Id.* at *11.

The Commission also placed little weight on the testimony of Ryan's character witnesses. First, it stated that, as a general rule, it does not accord significant weight to the character testimony of a witness unless a witness is qualified as an expert. *See id.* Second, it found this testimony to be insufficient because it reflected a limited appreciation for the public interest and the customers harmed by Ryan's actions. *See id.*

Finally, the Commission dismissed Ryan's argument that his trading record had been exemplary since returning to the market because the ongoing administrative proceeding gave Ryan a special incentive to obey the law. *See id.* As a result of these findings, the Commission determined that Ryan failed to make a clear and convincing showing that his registration as a floor trader would pose no substantial risk to the public and denied his application for registration. *See id.* at *12.

Finally, the Commission addressed the question of whether Ryan should be prohibited from trading. The Commission found a clear nexus between Ryan's misconduct and the proper functioning of the market. *See id.* Ryan proposed to trade as a floor trader, which is a role that would place him in a position to repeat his criminal activity. This fact together with the Commission's perception that Ryan's felony convictions were aggravated by a pattern of related illegal conduct of accommodation trades, curb trading, and felony wire fraud convinced the Commission that Ryan failed to overcome the presumption that his continued access to Commission-regulated markets would pose a threat to their integrity. *See id.* at *12–*13. Consequently, the Commission ordered a trading ban of six years, a cease and desist order, and a registration denial.

Ryan appeals to this Court.

## II. ANALYSIS

We disturb factual determinations only if they are not supported by the weight of the evidence. *See LaCrosse v. CFTC*, 137 F.3d 925, 929–30 (7th Cir. 1998); *Monieson v. CFTC*, 996 F.2d 852, 858 (7th Cir.1993). An agency's findings which run counter to those of an ALJ are given less weight than they would otherwise receive. *See Morris v. Commodity Futures Trading Commission*, 980 F.2d 1289, 1293 (9th Cir.1992).

Our review of legal questions or the application of law to facts depends "on the nature of the question and the comparative qualifications and competence of the decisionmakers." *Monieson*, 996 F.2d at 858; *see also Morris*, 980 F.2d at 1292. We apply a deferential standard to questions of law encompassed by the agency's expertise so long as the agency's conclusion is reasonable. *See Monieson*, 996 F.2d at 858. "When the question is of the sort that courts commonly encounter, de novo review is proper." *Id.* (citing *Morris*, 980 F.2d at 1293). With regard to the agency's imposition of sanctions, the choice of sanctions "[is] not to be overturned unless the Court of Appeals might find it 'unwarranted in law or … without justification in fact.'" *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973) (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 112–13, 67 S.Ct. 133, 91 L.Ed. 103 (1946)). If the agency's sanction falls within the statutory limits, it must be upheld unless it reflects an abuse of discretion. *See Chapman v. CFTC*, 788 F.2d 408, 411 (7th Cir. 1986); *see also American Power & Light Co.*, 329 U.S. at 112–13, 67 S.Ct. 133.

### A. *Double Jeopardy*

Ryan contends that the Commission's imposition of a trading ban and the denial of a floor trader registration application constitute penalties which the Double Jeopardy Clause precludes. Our inquiry in this matter is controlled by the Supreme Court's decision in *Hudson v. United States*, —— U.S. ——, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), and our recent decisions in *LaCrosse*, 137 F.3d 925, and *Cox v. CFTC*, 138 F.3d 268, (7th Cir. 1998). In Hudson, the Supreme Court

noted that the Double Jeopardy Clause "protects only against the imposition of multiple criminal punishments for the same offense." —— U.S. at ——, 118 S.Ct. at 493. The Court therefore established a test that focused on whether the sanction at issue may properly be deemed "criminal." *See id.*

■ In LaCrosse, we determined that the Commission's imposition of a trading ban, pursuant to § 9(b) of the Act, after a criminal conviction for the same conduct did not raise double jeopardy concerns. *See* 137 F.3d 925, 930–32. Following the reasoning in LaCrosse, we find Ryan's argument that the trading ban violated his protection against double jeopardy unavailing. A trading ban is not "criminal" for purposes of the Double Jeopardy Clause.

In *Cox*, we determined that the Commission's revocation of a floor broker's registration under §§ 8a(2)(D) and (E) of the Act after a criminal conviction for the same conduct also did not raise double jeopardy concerns. *See Cox*, 138 F.3d 268, 271–74 . Following the reasoning in *Cox*, we find Ryan's argument that the denial of his floor trader's registration violated his protection against double jeopardy to be equally unavailing. Our conclusion that clear proof does not exist to " 'override legislative intent and transform what has been denominated a civil remedy into a criminal penalty,' " *Cox*, 138 F.3d 268, 273–74 (quoting *Hudson*, —— U.S. at ——, 118 S.Ct. at 493), is not altered because it was a floor trader's registration instead of floor broker's and the Commission denied Ryan's registration petition rather than revoke an already existing registration. Denial of an applicant's floor trading registration is not "criminal" for the purposes of the Double Jeopardy Clause.

### B. *Abuse of Discretion*

Ryan raises a series of arguments contending that the Commission abused its discretion. We address each argument in turn.

### 1.

Ryan contends that the Commission abused its discretion by not following its precedent which requires it to defer to an ALJ's findings and conclusions on the applicability of sanctions when they reflect a reasoned application of the law. It is true that in prior cases the Commission has held that it would not substitute its judgment for the ALJ's determination unless the ALJ abused its discretion. *See Ryan I*, 1993 WL 316031, at *1; In re Scheck, [1992–1994 Transfer Binder] Comm. Fut. L. Rep. para. 25,834, No. 92–11, 1993 WL 316022, at *1 (C.F.T.C. Aug. 13, 1993); *In re Schneider*, [1992–1994 Transfer Binder] Comm. Fut. L. Rep. para. 25,842, No. 91–9, 1993 WL 316027, at *1 (C.F.T.C. Aug. 13, 1993). However, the Commission changed this policy in *In re Grossfeld*, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 26,921, No. 89–23, 1996 WL 709219 (C.F.T.C. Dec. 10, 1996).

■ In that case, the Commission specifically addressed an ALJ's assessment of sanctions. Recognizing "the increasingly important role that sanctions play in deterring wrongful conduct and maintaining market integrity," *id.* at *11, the Commission concluded that it should reinstate an older policy of exercising its independent judgment in assessing sanctions. *See id.* In returning to a *de novo* standard of review, the Commission reasoned that this review is consistent with its ultimate responsibility to determine the appropriate sanction in each case. *See id.*

We see no problem with the Commission evaluating an ALJ's findings and determinations with a *de novo* standard of review. Under the Administrative Procedure Act ("APA"), an agency reviewing an ALJ's decision "has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule." 5 U.S.C. § 557(b); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (reasoning that an agency's responsibility for a decision "is wholly inconsistent with the notion that it has power to reverse an examiner's findings only when they are 'clearly erroneous' "); *Mattes v. United States*, 721 F.2d 1125, 1129 (7th Cir.1983). Because the APA authorizes the Commission to review an ALJ's findings and determinations *de novo*, the Commission did not abuse its discretion in applying that standard in this case.

### 2.

Ryan also argues that the Commission abused its discretion by failing to defer to the ALJ on matters of credibility. In finding that Ryan was fully rehabilitated and not a threat to the integrity of the markets, the ALJ accepted the testimony of Ryan's character witnesses. *See ALJ II*, 1994 WL 130024, at *6. In reversing the ALJ, the Commission discredited the testimony of these witnesses as evincing only a "limited appreciation for the interest of the public." *Ryan II*, 1997 WL 208881, at *11. The Commission's cases subsequent to *Grossfeld* confirm that, even though it evaluates an ALJ's findings and determinations in general de novo, the Commission defers to an ALJ's judgment in making credibility determinations. *See Bishop v. First Investors Group of Palm Beaches, Inc.*, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 27,004 at 44,840, No. 94–R156, 1997 WL 13882, at *6 (C.F.T.C. March 26, 1997); *Ricci v. Commonwealth Fin. Group Inc.*, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 26,927 at 44,443–44, No. 95–R043, 1996 WL 729367, at *2 (C.F.T.C. Dec. 20, 1996). Because Ryan views the Commission's decision as completely disregarding the ALJ's credibility determinations, he believes the Commission abused its discretion.

■ We disagree. An administrative agency may discredit the weight of a witness's testimony without impinging on an ALJ's credibility determinations. *See NLRB v. Stor–Rite Metal Prods., Inc.*, 856 F.2d 957, 964 (7th Cir.1988); *Kopack v. NLRB*, 668 F.2d 946, 953 (7th Cir.1982). Credibility in this context refers primarily to testimonial inferences (inferences drawn from direct observations of the demeanor of witnesses) rather than derivative inferences (inferences drawn from the substance of the evidence).[9] *See Stor–Rite*, 856 F.2d at 964. The Commission must attribute significant weight to an ALJ's findings based on a witness's demeanor because it does not have the opportunity to observe a testifying witness. *See id.* This recognition, however, does not preclude the Commission from discounting the weight that an ALJ places on witness's testimony when the Commission questions the witness's basis of knowledge.

■ Here, in rejecting the testimony of Ryan's character witnesses that Ryan was rehabilitated, the Commission focused on their basis of knowledge. First, it applied a general policy that it does not accord significant weight to character testimony unless that witness is qualified as an expert in rehabilitation. *See Ryan II*, 1997 WL 208881, at *11 (explaining that almost everyone can produce a friend or colleague attesting to the witness's belief that the defendant will not repeat his violative conduct). Second, it stressed that the testimony "reflected at most a perfunctory concern with the customers harmed by Ryan's wrongdoing." *Id.* "Findings of rehabilitation require consideration of evidence extrinsic to that presented by ... [a testifying] witness and depend upon more than his demeanor." *Ghassan v. INS*, 972 F.2d 631, 635 n. 6 (5th Cir.1992). Even though the ALJ may have made a credibility determination in accepting the testimony of Ryan's character witnesses, the Commission did not challenge the credibility of these witnesses in discounting the weight of their testimony. The Commission could have accepted every statement that these witnesses made and still valued this testimony less for failing to incorporate the customer protection values the Commission holds important. Thus, it did not abuse its discretion.

### 3.

■ Ryan also argues that the Commission abused its discretion by failing to consider whether Ryan would continue to pose a substantial risk to the public or the integrity of the market if an exchange or clearing firm supervised him under a conditioned or restrictive registration. As we stated earlier, Ryan seeks registration as a floor trader. To this end, he submitted letters from Thomas Donoval of the CBOT and John J. Ruth, President of the LIT Clearing Services, stating that they would supervise his trading if

9. While the distinction between testimonial and derivative inferences will not always be clear, we believe in this instance it is sufficiently so for our purposes.

the Commission granted Ryan conditional or restrictive registration as a floor trader.

Though it is correct that proof of a suitable supervisory arrangement may ease an applicant's burden of proof, *see* 17 C.F.R. § 3.60(f)(3), we do not consider the Commission's refusal to evaluate the effect of a supervisory relationship on Ryan's risk to the market to be an abuse of discretion. In its analysis, the Commission discounted Ryan's evidence of mitigation and rehabilitation. A proposal by an exchange or clearing firm may aid an applicant in lowering the quantum of other evidence needed to show an applicant is worthy of registration, but it cannot serve as a substitute for persuasive evidence of mitigation and rehabilitation. *See In re Zuccarelli,* [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 27,221, No. SD 97–3, 1998 WL 2517, at *6 (C.F.T.C. Jan. 2, 1998). Since the Commission did not attribute much weight to the remainder of Ryan's mitigation and rehabilitation evidence, it was reasonable for it not to reach the question of whether a supervisory arrangement reduced the risk to the public. Consequently, the Commission did not abuse its discretion by not discussing it.

### 4.

■ Next, Ryan suggests that the Commission abused its discretion by incorporating factors irrelevant and immaterial to these proceedings as it tried to "harmonize" the sanctions with other administrative cases. As support for this argument, Ryan relies on a statement the Commission made in opposition to a motion by Ryan requesting a stay. In explaining why there was a delay in issuing its decision, the Commission stated that it was a "result in part of the Commission's effort to harmonize the results in the various cases." C.F.T.C. Mem. in Opp'n to Renewed Mot. to Stay at 19 n. 13. The Commission contends that any harmonizing that occurred is the result of its application of consistent legal principles in cases that involve similar issues.

Our review of *Ryan II* confirms that the Commission considered Ryan's evidence of mitigation, rehabilitation, and his future role in the marketplace. Other than the Commission's harmonizing comment which is facially ambiguous, Ryan has produced no evidence from *Ryan II* or elsewhere to show that the Commission considered extraneous evidence. To us, the Commission's harmonizing statement is nothing more than a recognition of the Commission's duty to ensure that similar misconduct is given consistent treatment. Thus, we do not find an abuse of discretion.

### 5.

Ryan argues that he has produced sufficient evidence that mitigates his wrongdoing to rebut the statutory presumption of a trading ban. He puts forth four arguments that the Commission abused its discretion in making its mitigation findings by failing to give sufficient weight to his evidence.

Ryan first challenges the Commission's mitigation findings by arguing that the Commission approved a rule change that condoned most of his past misdeeds. He insists that before the rule change he and "virtually everyone else on the CBOT floor" engaged in a trade practice referred to as "curb trading," i.e., executing orders after the end of trading. Pet. Br. at 23. Ryan believes that the subsequent recognition of the practice together with its widespread nature mitigate his wrongdoing.

■ While the CBOT later changed its rules to permit a trader to engage in some form of curb trading, the CBOT, the Commissioner, and Congress have never legalized the fraud underlying Ryan's convictions. Though his actions may be characterized as curb trading, Ryan was convicted of knowingly participating in prearranged, noncompetitive trades and attempting to mask these transactions by generating false records. Ryan was obligated to know and follow the rules of the Commission and the CBOT. The fact that the CBOT subsequently changes its rules on curb trading does not justify noncompetitive trading that defrauds customers, was illegal at the time it was committed, and is still illegal. Hence, the Commission did not abuse its discretion by focusing on Ryan's felony violations of § 4(b) for deceiving his customers and offsetting customer orders to the customer's disadvantage.

■ Second, we agree with the Commission that the fact that other CBOT members may have also acted illegally neither explains nor mitigates Ryan's behavior. "[I]f an exchange is unable or unwilling to enforce compliance with applicable law, there is a greater need for the Commission to impose sufficiently significant sanctions to deter others from similar behavior and to protect the public interest." *Ryan II,* at 1997 WL 208881, at *10. Accordingly, we find no abuse of discretion.

■ Third, on appeal, Ryan also continues to assert that his misconduct constituted crimes of convenience. While he concedes that theoretically it is possible that his misconduct may have harmed customers, he argues that his acts were "not the kind of business that stole any money from widows and orphans." Pet. Br. at 25–26. We cannot accept this argument. His attempt to frame his actions as ones of convenience reinforces the Commission's finding that Ryan does not appreciate the implications of his wrongdoing. As we have previously stated,

> [t]he selection of prices without competition deprived customers in the instant case of a clear market opportunity to obtain the best price for their orders. It does not matter if the defendants' customers were not harmed financially because of the scheme.... It is not necessary that a plan actually result in financial loss as long as it is aimed at the fraudulent deprivation of some of the victim's money or property.

*Ashman,* 979 F.2d at 478 (quotation marks omitted). Thus, the Commission did not abuse its discretion in dismissing Ryan's attempt to minimize the effect of his crimes.

Finally, Ryan asserts that the observations of the district court judge who sentenced him provide additional mitigation evidence. This argument, however, mischaracterizes the district court's observations. The court evaluated him relative to his co-defendants in concluding that he was a minor participant. *See Dempsey,* 768 F.Supp. at 1285. The fact that the court considered Ryan to be a minor participant in the wire fraud scheme does not mean that Ryan's criminal activity was not serious. Ryan's knowing participation in prearranged, noncompetitive trades violated well-established rules of the Commission and the CBOT. His wrongdoing is not mitigated because other traders and brokers in the soybean pit violated the law more frequently and for larger sums of money. Thus, it was not an abuse of the Commission's discretion to conclude that Ryan did not prove sufficient mitigating circumstances to rebut the statutory presumption.

6.

Ryan also insists that the record is replete with evidence that he is fully rehabilitated. He believes that the Commission abused its discretion in concluding that his production of evidence of rehabilitation was insufficient to overcome the statutory presumption of unfitness arising from his four felony convictions.

■ First, Ryan contends that the Commission ignored the 'spotless post-conviction trading record that he has amassed since his wrongdoing. The Commission's precedent makes clear that such evidence is instructive on the question of rehabilitation, but not dispositive. *See In re Bryant,* No. CRAA 88–3, 1990 WL 282904, at *9 (C.F.T.C. April 18, 1990) (noting that absence of wrongful conduct "may be a factor indicating rehabilitation"); *In re Akar,* No. 82–29, 1986 WL 66157, at *8 (C.F.T.C. Feb. 24, 1986) ("[T]hough not determinative, time is a 'relevant factor' in the Commission's consideration as to whether an applicant has been rehabilitated."); *see also LaCrosse,* 137 F.3d 925, 932–33.

By giving little weight to the period of trading without incident, the Commission followed an established policy which recognizes that a pending administrative action creates a unique incentive for good conduct. *See Ryan II,* 1997 WL 208881, at *11. The passage of time without incident has less probative value because "[i]t is in the interest of one who is the subject of an outstanding administrative complaint to make every effort to insure that his conduct conforms to the spirit as well as the letter of the law, at least during the period of adjudication, in order to avoid additional charges and also to reduce the likelihood of receiving a severe

sanction." *In re Silverman*, [1977–1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 20,410, No. 76–18, 1977 WL 13527, at *3 (C.F.T.C. Mar. 14, 1977); see also *LaCrosse*, 137 F.3d 925, 932–33; *Cox*, 138 F.3d 268, 275–76. We do not find an abuse of discretion in the Commission's decision to accord less weight to Ryan's evidence in recognition of the incentives provided by an ongoing investigation. It was reasonable and in accordance with Commission precedent.

▬ Second, Ryan claims that the Commission should have given greater weight to his expression of remorse and promise to refrain from future violations. The Commission has repeatedly recognized that " 'expressions of contrition following detection only deserve significant weight if the wrongful nature of the conduct was unclear at the time of the violations.' " Cox, 138 F.3d 268, 274–75 (quoting *In re Cox*, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 26,939, No. 91–14, 1997 WL 20733, at *9 (C.F.T.C. Jan. 17, 1997)). It did not give Ryan's expressions of regret decisive weight because the Commission found that Ryan did not establish that he was confused about the illegality of his actions. At the time of Ryan's violations, all CBOT members were on notice that noncompetitive trading was illegal. This finding does not constitute an abuse of discretion.

Third, Ryan maintains that the Commission should have accorded substantial weight to his character witnesses because they are "experts in the markets that the Commission regulates" and in a good position to determine whether he posed a "threat to the public or the integrity of the markets." Pet. Br. at 31. Ryan called John J. Ruth, President of LIT Clearing Services, Donald Andrew, Senior VicePresident at Lehman Brothers, and Charles Brown, a long-time friend and trader at the CBOT. The Commission did not afford significant weight to the testimony of these witnesses because none was qualified as an expert in rehabilitation. *See Ryan II*, 1997 WL 208881, at *11. In comparison, the Commission cited *In re Walter*, a case in which a probation officer, "who worked closely with respondent for a signifi-

cant period after his conviction, had experience and expertise that buttressed the reliability of his opinion that respondent did not present negative risk to community." *Id.* Because none of Ryan's witnesses possessed these characteristics, the Commission felt their opinions were entitled to only limited weight.

While we recognize the reasonableness of according an expert's testimony more weight than a layman's, we must confess some confusion on the question of who satisfies the Commission's definition of "expert." *See LaCrosse*, 137 F.3d 925, 933–34; *Cox*, 138 F.3d 268, 275–76. Apparently a probation officer will suffice, but business and personal associates will not. The Commission has failed to give any guidance beyond these outside parameters. "Would a psychologist suffice? Or a social worker?" *Cox*, 138 F.3d 268, 275–76. The answers to these questions remain elusive because the Commission has not set forth the criteria for deeming a person an "expert in rehabilitation."

▬ As we stated in *LaCrosse*,

The concept of a "rehabilitation expert" is novel. Predicting future crimes is a roll of the dice; there are no genuine "experts" about who is likely to commit which offenses tomorrow, or even what classes of persons poses genuine risks.... By failing to set forth the relevant and necessary characteristics for rehabilitation experts, the Commission gives itself free rein to discredit any manner of testimony.

137 F.3d 925, 930–31. Until the Commission provides some guidance regarding the kind of testimony it will accept, we will consider it to be an abuse of discretion for the Commission to discount the testimony of character witnesses solely for not being experts.

▬ Notwithstanding the lack of instruction on this issue, we do not hold that the Commission's abuse merits a reversal in this case because the Commission offered a valid reason to accord this testimony limited weight. Ryan's witnesses characterized his acts as minor and merely the result of poor business judgment. The Commission viewed these witnesses as failing to appreciate the far-reaching effects of Ryan's acts on the

public interest and evincing only a perfunctory concern with customers harmed by Ryan's wrongdoing. *See Ryan II*, 1997 WL 208881, at *11. Because this is a legitimate, independent reason for limiting the value of this testimony, the Commission did not abuse its discretion.

## C. *Equity*

Finally, Ryan claims that his trading ban bears no rational relationship to his prior misconduct or the need for deterrence and thus should be set aside. Unfortunately, Ryan makes this argument to the wrong branch of government.

In enacting § 9(b), Congress determined that a felony conviction warrants the denial of a registration application and a trading ban for five years or such longer period as the Commission shall determine unless the Commission concludes that the imposition of this denial and ban is not required to protect the public interest. *See* 13 U.S.C. § 9(b). The Commission has interpreted this statute as establishing a presumption that a person convicted of a felony under that section would pose a threat to the public interest for a minimum period of five years.[10] See *LaCrosse*, 137 F.3d 925, 933–34.

■ Ryan had the opportunity to rebut this presumption. The Commission held that Ryan did not satisfy his burden and imposed a ban of six years. *See Ryan II*, 1997 WL 208881, at *13. Our standard of review in an instance like this where the sanction falls within the statutory limits is abuse of discretion, not *de novo*. As we do not find that the Commission abused its discretion in reaching its conclusion, we must uphold it. Ryan's plea to equity is unavailing.

Because we find Ryan's arguments based on the Double Jeopardy Clause, abuse of discretion, and equity to be unpersuasive, we Affirm the order of the Commodity Futures Trading Commission.

**CUDAHY, J.**, concurring:

Given the deferential standard of review of the Commission's actions, I agree with the result and, in general, with the analysis adopted by the majority. However, as a member (along with Judge Kanne) of the panel that reviewed Mr. Ryan's criminal conviction, *see United States v. Ashman*, 979 F.2d 469 (7th Cir.1992), I had earlier examined in some detail the circumstances which brought him and others to the present unhappy pass and may have acquired a perspective slightly different from that of the other members of the present panel.

In *Ashman*, the appellate panel rejected the government's argument that open outcry trading in and of itself implicated a property right that was protected under the mail and wire fraud statutes. *See id.* at 477–79. The panel reasoned that on "limit days"—that is, on days when the CBOT fixed the price of a commodity by limiting its permissible price movement—fraud was impossible because customers did not have an opportunity to obtain a better price. *See id.* at 479. In light of the lack of price competition, the defendants did not deprive customers of any money or property when they failed to execute limit-day trades by open outcry. *Id.*

Of course, limit-day trading is not before us as a basis for the denial of Mr. Ryan's registration application and the imposition of a six-year trading ban. Nonetheless, the earlier panel's rejection of a per se approach to trading that is not conducted by open outcry shows the ambiguities involved in assessing the criminal, or even moral, consequences of questionable activities in the trading pit. It is by no means a "slam dunk" to distinguish violations of convenience from crimes of fraud.

In *Ashman*, I was concerned that the majority's theory of culpability—that "[b]y picking customer prices and opposing traders, the defendants removed their customers from the pit's competitive marketplace and forced the customers to accept the results they selected, guaranteeing profits to the local and denying the customer the opportu-

---

**10.** The operation of this presumption is the Commission's interpretation of the relevant statute. Since the parties have not challenged this inter-

pretation, we apply the standard but do not vouch for its correctness.

nity to obtain a better price"—painted with too broad a brush. *See id.* at 497 (Cudahy, J., concurring in part and dissenting in part) (quoting majority at 477–78). I therefore wrote a separate opinion in an effort to distinguish between those trades in which the trader gained a clear financial benefit, and those trades where there was apparently no such benefit. I felt that such detailed scrutiny was warranted where felony convictions were at stake.

The majority opinion in *Ashman* is, of course, the criminal law of the circuit. But it seems to me that this does not relieve the Commission—which is effectively ending Mr. Ryan's career—of the obligation to examine his conduct from the vantage point of its own trading expertise. Instead, however, the Commission responds to Mr. Ryan's claim that he did not intend to harm customers only with the statement that the jury verdict in the criminal case "establishes conclusively that [Ryan] willfully acted to the detriment of his customers." *Ryan II* at * 9. Similarly, the Commission answers the argument that Mr. Ryan caused no actual harm to customers by quoting extensively from the majority's opinion in *Ashman.* See *id.* at nn. 23 & 24. But neither a criminal jury nor the Seventh Circuit, however authoritative their declarations, can claim expertise in the conduct of trading at the CBOT. Significantly, the ALJ, who was reversed by the Commission and who presumably has such expertise, concluded that "the transactions that resulted in Ryan's conviction do not necessarily reflect an intent to cheat or defraud customers ... I am inclined to believe that they were crimes of convenience." ALJ II at *4.

No doubt Mr. Ryan violated CBOT rules, as well as the Commodity Exchange Act. But whether Mr. Ryan sought to take money at the expense of customers has been bitterly contested before the Commission and in the federal courts. Accordingly, the Commission—certainly an expert in matters relating to trading—should give us the benefit of its independent conclusion whether in all instances Mr. Ryan acted from motives of fraud rather than motives of convenience. And if the Commission has concluded that Mr. Ryan acted to defraud, it should explain, without simply referencing the jury verdict or *Ashman*, why and how Mr. Ryan engaged in such fraud. No doubt *Ashman* is an authoritative exposition of the criminal law, but in this civil proceeding of great consequence for Mr. Ryan, the Commission as decision-maker should provide us with its own understanding of his conduct and its import.